THOMAS R. DUNCAN, Administrator, Appellee, v. FORT DODGE GAS & ELECTRIC COMPANY, Appellant.

**NEGLIGENCE: Verdict in re Death by Electric Shock.** A finding of death by electric shock is amply supported by a showing (1) that a person of unimpaired health took hold of an ordinary electric fan; (2) that his body became rigid and speechless; (3) that, when the current was released, the body crumpled to the floor, with life extinct; (4) that there was a burn upon the hand; and (5) that the body had the appearance of one killed by electric shock.

**ELECTRICITY: Presumption of Negligence.** Testimony tending to show (though not conclusively) that a system of secondary electric wiring under the control of a householder was in good order and without any negligent defect which would account for an excess and dangerous current which flowed from an ordinary electric light socket, justifies a finding that the negligent defect which would account for such excess current was in the system of primary wiring under the control of the owner of the generating plant.

**EVIDENCE: Weight and Sufficiency—Proof Beyond Reasonable Doubt.** A party is not required to prove his theory of negligence by testimony so clear as to exclude every other possible theory. So held in an action for death by electricity.

*Appeal from Webster District Court.*—H. E. FRY, Judge.

JUNE 23, 1922.

ACTION at law, to recover damages for the death of Ora Duncan. Verdict and judgment for plaintiff, and defendant appeals.—*Affirmed.*

*Healy & Breen,* for appellant.

*Kelleher, Hanson & Mitchell,* for appellee.

WEAVER, J.—The plaintiff's intestate, Ora Duncan, a young man of 21 years of age, died in the city of Fort Dodge, Iowa, under circumstances as follows: Deceased was in the employ of the Fort Dodge Creamery Company, and as such was charged with the duty of delivering ice cream to the company's customers in that city. Among the customers so supplied were Merrill & Brown, proprietors of a business occupying a room or place in the front part of a large building known as the Wahkonsa Hotel. The room fronted north on the principal street of the city. In the northwest corner of the room was a soda fountain. Extending southward from the fountain were a front and a back bar. Under the front bar, at its south end, were containers supplied with ice, surrounding cans holding the cream. On the bar was an electric fan. The electric current to the fan was supplied through a cord or insulated wire extension from a socket at the south end of the bar, and along its surface. The fan was not fastened to the bar, and could be moved about within the length of the cord. It was the custom of the deceased to deliver ice cream to Merrill & Brown at this store every morning during the summer months. Pursuant to this custom, the deceased delivered a supply of ice cream to the Merrill & Brown store on July 24, 1916, and according to his usage, undertook to pack the containers holding the cream with cracked ice and salt. The electric fan was running, and the cord was lying on the bar in the usual way, and hanging down in front of the containers. There were several persons in the room, though no one appears to have been giving particular attention to Duncan's movements. He was seen to come in from the front, with a pail of ice and a smaller receptacle of salt. He appears to have faced the bar under which the cream was kept, and it is inferable that he took hold of the fan to move it aside and proceed with the packing, when an employee of the store heard a short cry or exclamation, and looking, saw Duncan leaning against or over the back bar, holding the electric fan in his right hand. The witness, believing that the young man was suffering from electric shock, at once unscrewed the plug in which the fan cord was inserted, thereby releasing the current, if any, in the fan. When this release was accomplished,

Duncan began to fall or crumple down, and was dragged away from the bar. He did not speak, but gave utterance to a groan. A physician was immediately called. The arrival of the doctor was not immediate, but not long delayed, and he found the young man in a dying condition, or already dead. Resort was had to the use of a pulmotor and other restorative efforts, but without avail. Deceased had been in apparently vigorous health, and there is no evidence tending to show anything abnormal in his physical condition up to the time of his collapse. The electricity operating the fan was derived from a connection with the electric system maintained by the defendant company.

It is the plaintiff's theory that Duncan's death was caused by an electric shock, and that such shock could not have been produced except by some defect in the management or control of the primary current whereby the secondary wiring through which power to the fan was supplied had become overcharged with an excessive and dangerous voltage. It is claimed by the plaintiff, and there is evidence tending to show, that, under normal conditions, with a secondary system of wiring properly installed and maintained, the current delivered to the fan would be not to exceed about 110 volts; and that such current is not of a dangerous character; and that, if such secondary system is properly installed and maintained, it will not become overcharged with a dangerous voltage, except by some fault in the primary or high-tension system or in the transformer through which a modified or milder current is supplied for ordinary uses of the company's patrons.

The defendant, on the other hand, challenges the proposition that deceased died from electric shock, and insists that, even if it be found that he died from electric shock, there is no evidence that such injury was caused by any negligence on its part. Bearing upon these issues, a large volume of testimony is offered on either side. It would serve no useful purpose, and would require an opinion of tedious length, to enter upon a review of the testimony of the individual witnesses; and we shall not enter that field, except as occasion may arise therefor to render clear our views upon the more important questions raised by counsel in argument.

I. Turning first to the inquiry whether there is evidence to justify a finding that deceased died from electric shock, we regard it as clear that such conclusion has sufficient support in the record. No other reasonable theory of the death is advanced. Except for the appellant's insistence that there was no overload or dangerous current upon the wire supplying electricity to the fan, all the circumstances attending the tragic ending of the young man's life, as detailed by all the witnesses on both sides who were present and speak from personal observation, are consistent with plaintiff's theory in this respect. There was a current of electricity of some degree of strength upon the wire; the hand of the deceased clasped or rested upon the fan; with that grasp, his form became rigid, his tongue became speechless; upon the release of the current, the tension of his muscles relaxed, and he began to slide or crumple toward the floor; there was testimony tending to show an electric burn upon his hand, and also that his dead body exhibited the appearance characteristic of those who have been killed by electric shock. All these things, coupled with an affirmative showing that the deceased, up to that moment, exhibited all the appearance of unimpaired health, and the entire absence of evidence of death from any other cause, make up a state of circumstances which forbids us to hold, as a matter of law, that death by electric shock was not established.

1. NEGLIGENCE: verdict *in re* death by electric shock.

II. If, as we hold, the fact of death by electric shock be supported by evidence warranting its submission to the jury, we have next to inquire whether the charge of negligence made in the petition has any substantial support in the record. To answer this intelligently and fairly necessitates consideration of the time, place, and circumstances attending the death of the intestate. The defendant was engaged in the maintenance and operation of an electric plant, and delivering the current to its patrons for lighting and power purposes. In practical operation, the business involves the use of primary wires, carrying a high tension of electricity from the central plant to various parts of the territory served, and of a so-called secondary system, made up of the wiring and other equipment installed in the buildings,

2. ELECTRICITY: presumption of negligence.

shops, and·business places to which the current is supplied for the use of the company's patrons.  The connection between the primary and secondary wires is regulated and controlled by transformers and other like devices, by means of which only so much of the current is taken off the primary wires as is needed by the individual customer.  For ordinary uses, such as the maintenance of lights or the operation of small motors, a comparatively light voltage is required, and its use is not ordinarily regarded as dangerous.  The primary wires, carrying a high voltage, and the transformers and other devices controlling the current from such wires are furnished by the company, and are subject to its exclusive charge and control.  The secondary wires and equipment are generally put in or paid for by the company's patrons. · For any neglect in the construction, maintenance, or operation of the primary system, the company, ordinarily speaking, is alone liable; but for injury or loss resulting from the neglect of the individual customer in installing, maintaining, or operating the secondary system, the company is ordinarily not liable.  If, however, injury is sustained by reason of an excessive current negligently allowed to pass through the transformer or otherwise negligently allowed to escape from the primary wires and to overcharge the secondary system, the company is liable therefor.  *Witmer v. Buffalo & N. F. Elec. L. & P. Co.,* 187 N. Y. 572 (98 N. Y. Supp. 781); *Crowe v. Nanticoke Lt. Co.,* 209 Pa. 580 (58 Atl. 1071); *Gilbert v. Duluth Gen. Elec. Co.,* 93 Minn. 99 (100 N. W. 653); *Denver Cons. Elec. Co. v. Lawrence,* 31 Col. 301 (73 Pac. 39); *Bice v. Wheeling Elec. Co.,* 62 W. Va. 685 (59 S. E. 626); *Ohrstrom v. City of Tacoma,* 57 Wash. 121 (106 Pac. 629); *Denson v. Georgia R. & Elec. Co.,* 135 Ga. 132 (68 S. E. 1113).

To negative any inference that the overcharge of electricity, if any, upon the fan or upon the wire attached thereto was the result of any fault or defect in the secondary wiring, plaintiff offered considerable testimony fairly tending to show that it was in good order, and without a defect to which the excess of current, if any, could reasonably be attributed.  It is not required that such showing should be of a conclusive character.  The evidence tends to show, and witnesses for the defense seem

to agree, that, if there was a dangerous overcharge of electricity upon the fan, and there is no apparent cause therefor 'in any defect of the secondary system, then the fact of such overcharge indicates a defect in the primary system. Indeed, such appears to be the well established rule of the precedents, and has a sound basis in principle. The company has exclusive charge and control of the dangerous primary current; and the alleged injury is such as, in the ordinary course of things, does not occur if those having such control use proper care. It affords, therefore, reasonable evidence (in the absence of explanation) that the injury arose from the negligence of the party charged with the duty of care. *San Juan L. & T. Co. v. Requena,* 224 U. S. 89 (56 L. Ed. 680).

Bearing upon the question is the case of *Royal Elec. Co. v. Heve,* 11 Quebec (K. B.) 436, an action for damages for the death of a person receiving a fatal shock from an ordinary electric light bulb, where the court, after stating the general rule imposing the duty of supervision and care resting upon the company, holds that it is bound to diligence proportionate to the peculiar character and danger of the commodity in which it deals, and is liable in damages for the death, though the cause of the unusual intensity of the electric current is not clearly established, since presumptively the extra electricity came over the same system and from the same source as that from which the ordinary supply was delivered, and the electric company had failed to show the contrary. So, in *Crowe v. Nanticoke Lt. Co.,* 209 Pa. 580 (58 Atl. 1071), where the death stroke was received through an ordinary incandescent light, it was held that a presumption arose that the company was negligent. To the same effect is *Witmer v. Buffalo & N. F. E. L. & P. Co.,* 112 App. Div. 698 (98 N. Y. Supp. 781, affirmed in 187 N. Y. 572); *Hill v. Pacific Gas & Elec. Co.,* 22 Cal. App. 788 (136 Pac. 494); *Turner v. Southern Power Co.,* 154 N. C. 131 (69 S. E. 767); *Abrams v. City of Seattle,* 60 Wash. 356 (111 Pac. 168); *Raker v. Toledo & Ind. Ry.,* 20 Ohio Cir. Dec. (30 Ohio C. C.) 78; *St. Louis v. Bay State S. R. Co.,* 216 Mass. 255 (103 N. E. 639); *Cain v. Southern Mass. Tel. Co.,* 219 Mass. 504 (107 N. E. 380).

In *St. Louis v. Bay State S. R. Co.,* supra, the Massachu-

setts court, in sustaining a verdict for an injured plaintiff, says:

"It is true that there is no direct and positive testimony of specific negligence on the part of the defendant. Whether there was such negligence is a matter of inference."

And after a statement of the circumstances, the court proceeds:

"Here a person in the exercise of due care is injured by an unexplained accident, arising from an instrumentality in the control of the defendant, which, in the ordinary experience of mankind, would not have happened without fault on part of the defendant. This is the definition of the doctrine of *res ipsa loquitur*. * * * As average men, drawn from the body of the community, the jury might infer that this particular kind of accident usually does not happen except in consequence of negligence, and that, therefore, it did happen in this instance from negligence of the defendant, in the absence of some countervailing explanation. This seems more consonant with reason than to say that, as matter of law, no inference of negligence on the part of the defendant was warranted."

It is true, the defendant presents a strong array of medical witnesses testifying, for the most part, in answer to hypothetical questions, and supporting the theory that the death of deceased was not the result of electric shock; also, other witnesses testifying to absence of any material defect in the company's primary system or in the manner or matter of its connection with the secondary system: but due regard to the authorities we have cited, as well as to many others of the same general import, compels us to hold that the case, as made on the trial below, presents a clear instance of conflict of testimony upon the vital issues joined, and that the truth of the opposing contentions was for the jury, and not a matter of law for the court.

III.   Appellant makes the point that, to sustain plaintiff's charge of negligence by circumstantial evidence, the circumstances shown must be such as are wholly inconsistent with any other reasonable theory of the death of the deceased. It may be admitted that cases are to be found, and possibly some of our own, in which the rule is stated as quoted by counsel. It is,

3. EVIDENCE: weight and sufficiency: proof beyond reasonable doubt.

nevertheless, a misleading statement, as applied to disputed facts in a civil action. In its broadest sense, it has no proper application except in criminal cases where the evidence relied upon to establish the alleged crime is purely circumstantial. As applied to a civil action for damages for negligence, it goes no further than to declare that, if the circumstances relied upon to sustain the allegation of negligence are *equally consistent* with the theory of due care by the defendant, then plaintiff must fail. To state it in the form contended for by appellant would be to hold that, to sustain a finding of negligence on circumstantial evidence, the plaintiff's proof must be such as to exclude all reasonable doubt,—a proposition without support in principle or well considered precedent. The true rule has nowhere found better or clearer expression than is given by the Michigan court in *Schoepper v. Hancock Chemical Co.*, 113 Mich. 582 (71 N. W. 1081), an action for the recovery of damages for personal injury received from an explosion of nitroglycerin. The court, speaking by Montgomery, J., there says:

"Defendant's counsel contend that the cause of this explosion is a matter of mere conjecture; and it is said by counsel that it is not enough for plaintiff to prove circumstances consistent with her theory, but that these circumstances, and each of them, must preclude any other rational conclusion. This we take to be but another way of stating the proposition that the proof must exclude all reasonable doubt. It is hardly necessary to say that no such rule obtains in civil cases. It is true that, where an injury occurs that cannot be accounted for, and when the occasion of it rests wholly in conjecture, the case may fail for want of proof. But such cases are rare, and that rule should never be so extended as to result in a failure of justice, or in denying an injured person a right of action, where there is room for balancing the probabilities and for drawing reasonable inferences better supported upon one side than the other. * * * And, though the proof of plaintiff depended upon inference to establish the main fact, the question of whether the inference suggested by the plaintiff's theory is the correct one, or whether it was sufficiently rebutted, was for the jury."

Discussing the same question, this court has said:

"While plaintiff cannot recover upon a case which does no more than show a possibility that the injury is chargeable to the defendant's negligence, he is not bound to prove either the negligence or the proximate cause beyond a reasonable doubt. Such a rule would work an absolute denial of justice in a great majority of cases. Proximate cause is, under all ordinary circumstances, a question of fact; and, where it depends upon circumstances from which different minds might reasonably draw different conclusions, or where all the known facts point to the negligence of the defendant as the cause, the submission of the question to the jury affords no ground for assignment of error by such defendant." *Lunde v. Cudahy Packing Co.*, 139 Iowa 688, 700.

On the same subject, says the Massachusetts court:

"The plaintiff is not bound to exclude the possibility that the accident might have happened in some other way, but only to satisfy the jury by a fair preponderance of the evidence that it occurred in the manner in which he contended that it did." *Woodall v. Boston Elev. R. Co.*, 192 Mass. 308 (78 N. E. 446).

In *Whitney v. Clifford*, 57 Wis. 156 (14 N. W. 927), the Wisconsin court held erroneous the giving of an instruction in line with the contention of defendants in the present case, saying that in civil cases "the jury should find for the party in whose favor the evidence preponderates, although it be not free from reasonable doubt, or do not exclude the truth of any other theory. * * * The plaintiff was not bound to prove his case so clearly as to exclude the possibility of any other theory."

Such, indeed, is the universal rule of all the courts where the question has had consideration. This is not to deny that, in a few instances, stray or careless expressions may be found, giving color of support to the proposition relied upon by counsel; but, in so far as they tend to impose upon a party charging negligence in a civil case the necessity of sustaining it by anything more than a fair preponderance of evidence, either direct or circumstantial, they cannot be approved.

IV. It is objected that the court erroneously charged the jury, in substance, that proof of the happening of the accident was sufficient to make a prima-facie case for a recovery of dam-

**4. ELECTRICITY: presumption of negligence.**

ages. Such, however, is not the substance or effect of the instruction. The court told the jury that, if it was shown by a preponderance of evidence that the death of Duncan was caused by electric shock from a current of an excessive and dangerous voltage, that escaped or was transmitted from the defendant's wires into the building, and was further shown that deceased was free from negligence contributing to his injury and death, such facts were sufficient to establish a prima-facie case of negligence against the company, as charged in the petition; and that, if no further evidence was offered, tending to overcome or rebut the prima-facie case, it was sufficient to warrant a finding that defendant was negligent, as charged. As a part of the same instruction, the court further said that the burden or duty upon the defendant to rebut such inference of negligence did "not relieve the plaintiff from the burden of proving his case, nor cast upon defendant the burden of showing by a preponderance of evidence that it was not negligent," but that it simply imposed upon defendant the burden to meet or rebut the prima-facie showing made by the plaintiff. We discover no error in this charge to the jury. It is not a direction, in substance or effect, that defendant's negligence or liability may be predicated upon the mere fact of the accident or injury, but is rather an instruction that, if such injury was occasioned by the presence of an overcharge or "excessive or dangerous voltage of electricity,"—that is, a voltage in material excess of what was reasonably required for the use for which it was being supplied,—and the deceased did not by his own negligence contribute to his injury, these facts, not otherwise explained or avoided, were sufficient to make a prima-facie case of neglect on part of the defendant. That this must be so is clearly apparent. The company's primary system was the only source of supply of electricity to the secondary system of which the electric fan and connecting cord were a part. It alone controlled that supply. The normal current required for the operation of the fan was of very moderate voltage, not regarded as a source of danger. It was defendant's duty to furnish a current not unreasonably in excess of the power or intensity required to operate the fan;

and if, as a matter of fact, there was, at the time in question, upon this part of the secondary system an excessive and dangerous voltage, creating a condition fraught with peril to the lives of those coming in contact therewith, such condition, if unexplained or unrebutted, is sufficient to charge the company with negligence. The entire primary system from which this current was derived was in the company's exclusive control, and it alone measured and delivered to its customers so much of the current as was required for their individual uses; and it was its duty to provide and employ such methods and safeguards as would reasonably protect its patrons, their customers, and employees against danger therefrom. We think there was no prejudicial error in the charge of the court upon these features.

Some of the members of the court do not approve the foregoing instruction upon the subject of prima-facie evidence; but in view of the fact that, if Ora Duncan was killed by an overcharge of electricity escaping from the primary to the secondary wiring (and such is the theory of the claim sued upon), the case clearly falls within the scope of the rule as to *res ipsa loquitur*, the error, if any, in such instruction was without prejudice, and does not justify a reversal.

V. Counsel press upon our attention the fact that the secondary system of wiring in the Wahkonsa block and the store used by Merrill & Brown was not furnished or maintained by the electric light company, and that such company is, therefore, charged with no liability on account of any defects therein. For the purposes of this appeal, the proposition may be admitted. It is to be said, however, that the trial court, at the outset of its charge, carefully instructed the jury that the sole question of negligence to be passed upon was the defendant's alleged failure to use reasonable care to prevent a current of electricity of excessive and deadly voltage from entering upon the wires by which it supplied the current to the building used and occupied by Merrill & Brown, thereby creating a condition or state of danger, and causing the death of the deceased. To this single proposition of fact the attention of the jury was constantly directed. No evidence was offered or admitted tending to show any defect

or condition in the secondary system which would tend to cause or to account for the alleged excessive current supplied to the fan.

VI. At the request of the appellant, the court charged the jury that the company was not an insurer against all accidents to persons coming in contact with its electrical appliances, and that the extent of its liability is for the exercise of ordinary and reasonable care; also that, if Duncan did receive a shock from the current on the fan and was injured or killed thereby, and the current from which he suffered did not exceed the ordinary and usual voltage of approximately 110, then the plaintiff would not be entitled to recover damages.

Without pursuing further the matter of the instructions, we think that, as a whole, they fairly stated the issues and the law applicable thereto, and are without prejudicial error.

VII. The authorities cited by counsel on either side are too numerous to justify us in attempting their review, but the rules and principles which they tend to establish are fairly reflected in what we have said in the preceding paragraphs of this opinion. Possibly we should make somewhat more specific reference to the case of *Harter v. Colfax Elec. L. & P. Co.,* 124 Iowa 500, on which appellant has placed considerable reliance. The precedent does not seem to be in point. The defect by reason of which plaintiff in that case claimed to have been injured was in the secondary wiring, which fell from the ceiling of his bathroom, and over which the electric company exercised no care or control; and the court further found that there was no evidence of any overcharge or excessive voltage of current sent into the room. This clearly differentiates the cases.

We find no sufficient reason to disturb the verdict, and the judgment of the district court is—*Affirmed.*

STEVENS, C. J., EVANS, PRESTON, and DE GRAFF, JJ., concur.

FAVILLE, J., takes no part.